The first case is Stryker Corporation v. OsteoMed, LLC, No. 23-1925. Miss, can you help me? Is it Wang? Wang. Okay. When you're ready. May it please the court. This court should reverse on the Slater grounds or in the alternative vacate and remand on the Faulkner grounds. For the Slater grounds, under any construction of the tensile load limitations, the evidence unambiguously confirms that a posita would understand that tensile load limitations are met by the Slater plate regardless of whether the transfixation through threads are in the first bone. There's no substantial evidence to the contrary. For the Faulkner grounds, there's no substantial evidence that supports the board's finding of no anticipation because Faulkner expressly describes to a posita a bone plate for use across either a joint or a fracture. This court recently confirmed in the stage products case that an anticipation analysis is undertaken from the perspective of a posita and must take into account the knowledge of such a person. The board's finding of no anticipation here does no such thing. So let's talk first about the Slater grounds and the dispute is whether Slater discloses the so-called tensile load limitations. The board already found with respect to the 085 patent that Slater anticipates claims one through seven of the 085, which recite the same structural limitations as the challenge claims of the 608, the 776, and the 716 patents that don't have, except for without the tensile load limitations. So the primary question here is what, if any, additional evidence or additional disclosures are required of Slater in order to meet the tensile load limitations? And my understanding is your argument is as long as the structure is there, the tensile load limitation is practiced. Is that your argument? That is our first argument, but even... Where did you make that argument to the board? We have made that argument really since the beginning in the petition. So if you look at our original declaration of Dr. Gall, sure, it's paragraphs 114 and 154 of the Gall declarations. And let me see if I can find the appendix sites. But the point is, since the beginning... Do you want to get the appendix sites so we can look at it? Sure. I'm sorry. I'm sorry. 1824 to 1825 is paragraph 114, and paragraph 154 is 1856 and 1857. And so in the declaration, Dr. Gall explains that there is a screw head that is abutting the plate, and those are the structural limitations that are recited in claims one and 11 as well. But as you can see from the way that claims are written, the claims are written in a way to make it clear that you have this particular structure so as to... I mean, I see that this is describing the structure, but where does it say that structure necessarily performs the other limitation? So I guess the struggle here is that the way Slater describes the actual transfer of tensile load is really in exactly the same way that the 608 patent describes it, which the 608 patent doesn't describe the transfer of tensile load from the screw to the plate. It does describe the absorption of tensile load into the screw. And so we understand in a person... And again, we have to look at this from the viewpoint of a person of ordinary skill in the art. And a person of ordinary skill in the art understands, and it's really undisputed, especially when you look at the deposition testimony of Mr. Summers. Well, I understand your point is the structures are the same, so they must operate in the same way. But where does it say that, rather than just say the structures are the same? Do you see what I'm missing that last piece of they must operate in the same way? So Dr. Gall, when he explains what's happening, the first part he talks about the structure with the screw head abutting the plate. And then later he talks about when you have this, and he calls it a vise structure, then the tensile load is going to transfer from the screw into the plate. So when he talks about what the vise structure is, he's not saying that anyone cares about where the screw threads are. If you look at those paragraphs 114 and 154, those are with respect to Claim 1. Now, what the board did is say, basically, import limitations from Dependent Claim 9 into Claims 1 and 11 by requiring a particular screw thread structure. And the problem with that is that's completely inconsistent. Okay, even as we're with you on that, you're just saying that this is all, when he's describing how the screw is put through and stuff, and talking about the load, that that has to be read as showing the tensile load limitation. It does, and it also is exactly how it's described in the patent. And so, I'm sorry, go ahead. Please. Oh, what I was going to say is, what we have is the patent is describing the structure with the screw head abutting the plate, and then talking about, okay, there's tension in the screw, and tension in the screw goes through the screw into the head. And then there's no discussion in the patent itself about how does the screw, how does the tension from the screw get to the bone plate? And that's why we have to rely on a person of skill and the art. Can I just, I feel like I shouldn't be making your argument for you, and maybe I'm missing it, but why aren't you pointing me to 154 specifically, and talking about that it's talking about the structure enables the transfection screw to absorb tensile load when the second bone is loaded. Isn't that exactly what we're talking about, or am I misreading this? No, you're not misreading it, and I appreciate you with the assist there with respect to 154, because I think that actually makes it clearer. It makes it a lot clearer than 114. 114 is the structure, which is, makes a lot of sense. It's the same structure, but I think you have to go beyond just saying the structures are the same when there's this other limitation, assuming we find patentable weight in it, which I think we have to, and say why the structure meets that limitation. And the structure meets that limitation as is set forth in 154, because of, it has to, and again, like. Well, let me, let me see if I understand what you're saying on that, and with respect to the statement, which I gather you endorse of the expert, that this has to operate like a vice, right? Yes. Now, doesn't that depend on whether the screw threads are engaged in the second bone, but not the first? No, and I'm very glad you asked that question. Here's my, it seems to me that this is my high school shop class intuition on this, which is if you have a screw that has, is a smooth, either smooth or the hole that goes through the first bone is large enough so that the threads are not engaged in the first bone, fine. Then when you go into the second bone and you tighten the screw, you have a vice effect where the first bone and the second bone are all pushed up against the But if you have screw threads that engage the first bone and the second bone, then tightening the screw does not reduce the space between the first bone and the second. That's my problem with the vice characterization of this, if you understand what I'm saying. I do. I understand what you're saying, and I want to explain it in two different ways. So first of all. Am I right in characterizing what goes on if you have screw threads in both the first and engaging both the first and second bone? You are correct, but I think the vice. And therefore no vice. Well, the vice kind of took on its own life. And we have to remember that. But you're wedded to the vice theory. That was what you presented to the board and ultimately to us. So I'm having trouble seeing why that vice applies to a case in which the threads are engaged in both bones. I first want to point you to the 608 patent. So Appendix 417, Column 6, Lines 4 to 12. And that's where the 608 patent describes it doesn't matter. It does not matter where the screw threads are in order to absorb tension into the screw. And I think we're talking about two different things. Do you have to win on this argument? I thought the main thrust of this was that Slater showed a screw going through the first or in the three thing, three bone thing, the first two bones and only attaching in the third bone. Yes. So we don't have to win on the vice in order to win because we still have, there's a lag screw and you have to look at the lag screw from the viewpoint of a person of ordinary skill in the art. And we know that Slater describes a lag screw. We know that people of skill in the art know how to use a lag screw. And I actually do want to point you back to, if you look at page 5 of Ostia Mitz Appeal Brief, actually in the other case, when it's talking about the background of bone screws and bone plates with respect to looking at the Stryker patents, they point to a 1982 manual and they're like, look, in this manual it says, and it quotes from it, it says something about you have to apply the screw as a lag screw. Can I just ask you, because I'm a little confused now, do you think Slater shows a lag screw that only engages the final bone and not the first bone or, I mean, one of its embodiments, which I don't think is anticipatory, but might give you a teaching, is the three bone embodiment. But does it show that? It does show that because it shows a lag screw. How do we know in Slater that the screw that's going in doesn't engage the first bone? Two things. First of all, it doesn't matter if the screw engages the first bone. And I understand what you're saying about the vice. Let's just assume you lose on that argument because I struggle with that argument. I think my point, what I'm trying to get at is whether Slater shows that it doesn't engage the first bone, which is what I think their patent is. So we have not only that a person of skilly art understands what a lag screw is and understands that the whole point is. What in Slater? What in Slater? The disclosure of the lag screw in figure four. But then beyond that, Slater goes. Lag screws come in all dimensions. You can have a lag screw that has only half an inch of smooth, unthreaded portion, or you can have one that only has threads at the very end. I'm not sure that disclosing a lag screw necessarily gets you over the question of whether, that Judge Hughes is asking, whether Slater shows non-engagement of threads with the first bone in a two bone structure. So the two bone and the three bone structures are just different pathways. It's not a different structure. It's the same bone plate using and putting the screw in, whether you decide you're going to engage three bones or two bones. But Slater does describe, when it's describing figure four, it describes how to use the lag screw in the sort of more complicated situation where you have two joints. And so it says there are screw threads that will engage in the calcaneus and then the shaft slides through the tibia and the talus. So sliding through, you can't slide through the tibia and talus if you've got some threads engaged. OK, so I think it's pretty clear, even if you're not a person of skill in the art, that the threads are only in the terminal end in the calcaneus. With respect to the three bone structure, that sounds like a good basis on which to make an obviousness argument. But anticipation? Well, it's also anticipated because if you look at what the board said in the 085 patent and it's the 1453 case, the board said that the disclosures for Slater, for the three bone, are the same as for the two bone. So you can't pretend that the specification only applies to the three bone and not to the two bone. It applies to both. And so we think it's inconsistent to say, oh, a person of skill in the art is going to know how to use a lag screw for a three bone, but suddenly they don't know how to use it for a two bone. Why would that be? A person of skill in the art knows what a lag screw is. I did want to get back to that original point, though, that there are two different kinds of tensile load that are described in the 608 patent. OK, so one is the tensile load that is going into the screw when you're walking. So that external load, when there's load placed on your joint when you're walking. That's one kind. And that's the kind that I was describing in column six, lines four to 12 on Appendix 417, where it says in the patent that even if you have screw threads that are in the first bone, there's still going to be the absorption of tensile load into the screw. So it's a little bit different than the vice. OK, and so the second kind of tensile load that's described in the patent is the tensile load that you get during surgery. So when you're actually screwing the transfixation screw into the bone. And so as you're screwing the transfixation screw into the bone, the second bone is kind of coming closer to the first bone. That's the lag effect. And that's kind of what, Judge Bryson, you were talking about. OK, Counselor, you've used all your time, including your rebuttal time. We'll restore your rebuttal because we had a lot of questions. OK, thank you so much. Good morning. May it please the court. My name is Devon Bean and I represent Osteomed in these appeals. With respect to the questions Your Honor were asking about where to find this argument below in the record as to whether or not Slater, whether or not Stryker actually had to demonstrate transfer of tensile load through the disclosure of Slater, it's not in the record below. That was not a finding that the panel made in the final written decision. And the citations in Stryker's yellow brief at page seven do not bear out that this was presented below. So what about paragraph 154 of the Gall declaration? Why is it that sufficient to put the board on notice they were making this argument? Because the argument at 154 is that Slater actually discloses that limitation, not that it isn't entitled to patentable weight and doesn't need to be demonstrated at all and can simply be shown through the necessary showing of the structure of Slater. And we dispute that actually Slater discloses all the structural limitations as well. Are you saying their petition only argued that it didn't have patentable weight, not that Slater actually disclosed it? Because it seems that portion, if we read it, says it does disclose the tensile loading. And I think that's exactly what they argued below, Your Honor, is that Slater expressly disclosed the transfer of tensile load limitation. Now they're telling the court, you don't have to decide whether Slater actually discloses that limitation because it has to disclose it. It's not entitled to patentable weight. You only have to look at the structure. Those are two different things, that it's not entitled to patentable weight or it actually discloses it. Correct. Then that's the point. Below, they did not raise the argument that it is not entitled to patentable weight. I don't care about that argument. I mean, I don't understand that they're arresting their case on that it doesn't have patentable weight. I think their case is they argue that Slater discloses it because it's the same structure and therefore has the same kind of tensile loading. And that's what they're arguing, at least in part, to me on appeal. Why isn't that right? Because what they point to is the lag screw that only anchors in the calcaneus bone. And as the board found, for purposes of anticipation, Slater does not have the same disclosure for a two-bone screw. Okay, but that makes no sense to me, honestly. If it's a three-bone structure or a two-bone structure, it's still talking about the lag screw going through the first two bones and anchoring in the last one. And in elsewhere, the board says it makes no difference whether it's two bones or three bones. Why would that make any difference? If it's going through two bones and anchoring the third, it certainly could go through one bone. And it talks about it going through. So clearly, there's enough to suggest that the screw is of the type that goes through the first bone or two and anchors in the third. Why isn't that anticipatory? It's not just about transferring tensile load. It's about transferring tensile load through the head of the screw and into a particular portion of the plate. And so what Stryker has identified is a vice-like construct that they rely on the three-bone screw. And they just say transfer of tensile load has happened to the bridge portion of the  That is not disclosed in the express disclosure of Slater. There's nothing in Slater that talks about load being felt at the bridge portion of the plate at all. I'm having trouble understanding the significance of this vice-like phenomenon that is described in the expert's testimony and then picked up in the briefs. What's the relationship between the vice-type function and the tensile load? The relationship is that below, Stryker used this vice construct to argue that Slater necessarily discloses the transfer of tensile load. And so because of this vice construct where you're compressing across the joint, that it's necessarily there in the reference itself. But again, it's not expressly disclosed in Slater. And not only is it not expressly disclosed, again, there's no disclosure for purposes of anticipation that the load would be felt at a particular portion of the plate. None. So let me ask you this. Hypothetically, the structures were absolutely identical in every respect. And Slater just didn't say it transfers tensile loading. Wouldn't that still anticipate? I mean, if it's exactly the same structure, it has to work in exactly the same way. I think if the structures were fully identical, we would have a hard argument. But the structures are not fully identical. So what's different? Between the 608 patent and Slater? I mean, there's a number of differences. I don't want to talk about the two versus three bones because I don't find that relevant. What else is different? The figures in the 608 patent, for example, expressly show where the threads are. They show what the head of the screw looks like. But Slater describes a thing where the threads, where it only engages in the final bone. Let's just assume that's correct hypothetically. Then the threads, even if they're further up, if they're sliding through, it doesn't really matter whether they're further up as long as they only engage in the bottom.  The 608 patent also describes and shows what the head of the screw looks like and how it engages with the hole that is disclosed in the 608 patent figures as well. And I think it's... What does that mean? One of the key features is that the tensile load is transferred through the head and the engagement between the head and the hole would help with that, including by creating... You mean the head, the screw fits into the hole and the head is at the top on the plate? And the way that it engages in particular, it doesn't show that. If you look at... It doesn't show a screw going... It describes, at least in words, that the screw goes through a hole and only engages in the second bone or the third bone. I mean, I don't understand. And it seems to me like you and the board have required almost word-for-word description to anticipate, and that isn't our law. I don't believe that we've required that, but I think you can't turn to the... Can you explain to me why this... When you're talking about the head engaging, are you talking about anything different than the screw goes in and is tightened and rests on the plate? In a concave formation that absorbs the load into the bridge portion of the plate, which is not disclosed in Slater. Did the board rely on the fact that it wasn't concave? I don't believe they did, Your Honor. Well, then that's not good enough. The board relied on the two versus three, right? Correct. Which I don't find convincing. What else did the board rely on? The board also described the finite element analysis in Slater and how when... Do we need that if we find that the structures are the same and it goes through and only engages in the last one and we read paragraph 154 as designating a tensile load transfer? I think you do need it because the finite element analysis shows that when that plate was tested, that the load was felt above the screw formation and not at the bridge portion of the plate. And I would direct Your Honors to that disclosure of Slater. When it's discussing the finite element analysis at APPX 2510, it describes that the force stress was the highest stress was felt just above the angled screw formation, which is not the bridge portion of the plate. And then Stryker comes back and says, well, it's felt throughout the entire plate. But again, that's not anticipation. The disclosure here says that's not where it's felt. And in fact, when it used a lag screw and they tried to test the plate, the plate failed. And so we have disclosure of, to the extent you agree that there is disclosure of the transfer of tensile load through the head of the plate, it's above the screw formation and not at the portion that is claimed in the 608 patent. Let me try to tell you what I think you're arguing and help me if I've got this right. You're saying that the argument that the petitioner made to the board about Slater was that Slater discloses a vice-like structure and the board looked for a vice-like structure in Slater and didn't really find it, correct? Correct. And you say there's substantial evidence to support that. Correct. Maybe they didn't have to make that argument, but that's the argument they made. And that's the only argument that they made to try and satisfy this limitation. And your further argument, if I understand it correctly, that they are now arguing to us that the structures are identical in Slater and in the challenged claims and therefore inherently and necessarily the transfer of tensile load has to happen, but they never made that argument to the board. And they also never made an inherent anticipation argument to the board. So what I'm hearing is, to put it simply, you think maybe the science is totally on their side. They're right about everything they're saying about the physics, but you don't really care and we shouldn't care because they didn't make the legal arguments below that they needed to preserve those arguments in front of us. Is that basically what you're saying? That's correct. Much more articulate. Well, I don't know if it's articulate or not, but wouldn't it be strange for us to say essentially they're right about everything they're saying about the physics and the board should have understood that. But, you know, wouldn't it be weird for us to affirm the board based on these sort of legal technicalities when we'd be sort of blessing the wrong science? I don't think that it would be wrong at all because it's the petitioner's job below to present the arguments in the way and in the right legal framework to allow for the board to render that decision. And anticipation was not the right framework here. Where do you argue in your referees that they didn't, that there should be confined to the vice argument and not their argument that Slater has all this structure? I believe we argued in our red brief that they've waived that argument. Can you point that to me? Are you talking about 26 of your red brief? Yes, Your Honor. Well, that's the patentable weight argument. That's not that the structures are the same argument and therefore show the tensile load. I mean, that you address it on page 27, starting with letter B. And I don't see any waiver argument there. I just see you arguing that, what the board argued, that they relied on two different things to show anticipation. We argue at pages, starting on page 21 of our red brief, that the appellant sought to meet the transfer of tensile load through the vice-like construct, a concept not disclosed to Slater. We argue that they are now saying it's inherent, but that that argument was waived below. And then we discussed... I don't understand them to be making it necessarily an inherency argument per se, because they pointed to page 154, or one paragraph 154, that you don't have to get to inherency. He actually describes how Slater operates to do the tensile load. And on page 23 of our red brief, we argue that because Slater lacked the necessary disclosure that the board found, the appellants offered no other basis to demonstrate that they relied upon Slater embodiment to disclose the transfer of load limitations. And therefore, they failed to meet their burden. I don't really understand what's going on here. I mean, isn't their way of arguing that it's a vice-like structure their way of saying, in which you addressed on the merits, that Slater discloses a lag screw that goes through the first bone and only anchors in the second bone? That's the argument that they are making, correct. Right. So we can address that argument. And they also argue in their yellow brief. And how is Slater, how does Slater not show that the lag screw goes through the first bone and anchors only in the second bone? It's not clear that that's true or not. And I would point out, there's a statement that says the screw goes through these bones and anchors in the third one. At page 14 of Stryker's yellow brief, they argue even where a small portion of the threads of the lag screw engaged in the second bone. Well, sure. They make an alternative argument. But Slater on its face has discussion of a screw going through a bone. Through means through, not only partially through and engaging in the final bone. That would show the structure of your patent, wouldn't it? If it goes through the first bone and... I know you want to talk about the screw head, that's fine. But if we're talking about anchoring in the bottom bone, that shows it, doesn't it? Not to the point where there would be transfer of load into the bridge portion of the plate. OK. But the bridge portion is the point you were making earlier is the key, it seems to me, to the answer you just gave to Judge Hughes. Correct. So if it were anchored in the bridge portion, Judge Hughes's question, the answer to Judge Hughes's question is perhaps, but that's also not disclosed since Slater. OK. We've had a lot of questions. Do you want... This is the one you have a cross-appeal in, right? Yes. Do you want to talk about it briefly? I'll give you, just to preserve your right to reply on it, you get as brief as possible. You can always feel free to rest on your briefs. Briefly, on the 1453 proceeding relating to the 085, the board found that Slater anticipated claims 1 to 7, and those claims require that the hole defining the transfixation screw hole is at the bridge portion of the bridge portion. It's a particular location of the bridge portion. And the board concluded that the Slater hole that Stryker relies on is adjacent the bridge portion, but improperly read out the requirement that it be at the thickened portion of the bridge portion. Stryker argues in their briefing that we are trying to claim or read out the preferred embodiment, but the specifications of 608 patent discusses that the bridge portion 130 may include a thickened section 136. That's at APPX 460, column 8, lines 32 to 41. And the hole may be on the thickened portion 136. So you have disclosure in the specification that the hole can be on the thickened portion 136. The thickened portion can be part of the bridge portion 130. And so we believe it's consistent with the claim language in the 085 that specifically requires at the thickened section. And the board's finding that it's simply at or adjacent the bridge portion does not address the actual claim language. And so for that reason we believe the board's decision on those claims must be reversed. I just wanted to answer just a couple things that I was not able to find in my notes in the first place. Appendix 1107, our reply introduction below, is where we, that's like the first thing we say, is that the patent owner is relying heavily on functional limitations and statements of intended use. So I just want to make sure that you're aware of that. We don't think that there's any kind of waiver. We feel like we've made the same argument the entire time. I also want to point, column 6, appendix 417, column 6, lines 45 to 50, just to emphasize this point, that when you're talking about the loading that happens when you're walking, nobody cares what kind of screw it is. Nobody cares if it's a lag screw or not. The patent itself says the transfixation screw may be any component of hardware having a head, 152, configured to abut the surface of the bone plate, and a shaft operable to secure the bones together. That is all you need when you're talking about the external loading. And that's different than the lag effect that we're talking about. Can I just ask you to address, so assume I'm with you on that there's a screw that goes through the first bone and only engages the second one. I assume that seemed to make the argument that it still doesn't, the center still doesn't anticipate because it doesn't show precisely how the head hits the plate and absorbs the load. What's your response to that? Our response to that, and we cited to a lot of expert testimony there. And I think I'm going to go to the finite element analysis there. Well, can you perhaps answer it without that? Because the board rejected that, and that's a substantial evidence question, too, which I think you're vulnerable on. OK. The very fact that the tensile load is going to the area where the screw is, and counsel for Osteomed argues, oh, it's going above the screw hole or the screw head. And that's not what the bridge is. This is not a monolithic plate. So we've got a, we have testimony from Dr. Gall explaining that a person of skill and the art would have understood that tensile load can't be transferred just to the region above the screw hole without also going to the bridge. Because this is not some kind of weird magic plate where the tensile load can stop. It's going to go, if it goes there above the screw hole, it's going into the bridge. And so Appendix 3034, the Gall declaration at paragraph 49, and also the Gall reply declaration at paragraph 45 at 3031 to 3032 explains that. Did the board also rely on this argument that they didn't show that this, where the load was transferred to the screw head? I don't remember them really. It feels like the board mostly relied on the fact that it was the difference between two or three bones. And that you didn't necessarily show that Slater showed that the screw only engaged the bottom bone. I think that's what the board decision kind of comes down to. The latter is just wrong. I think that, or at least I think that there's a statement that says the screw goes through bones and engages the last one. So at least there's a explicit disclosure of not engaging the first bone. I think that's where they try to get, to me, a little too cute and say, well, it shows it with three bones, but it doesn't show it with two. I don't understand that at all. But did they also rely on this other point that even if Slater discloses all that, it still doesn't disclose the loading requirement about how it transfers the load to the screw? The load from the screw into the bridge? Yeah, that's what I mean. I don't think so. I don't think they really talked about that much. And to the extent they did, I'm just pointing you to this again. Slater is not a magic plate. It's not something where somehow the tensile load can just stop and only be concentrated in one spot. Well, but it seems to me pretty clear that if you have the screw coming in, let's say at the very tip of the plate, that's where the principal tensile load is going to be dissipated. Yeah, it may have some effect downstream to the other end of the plate, but a lot less than the tensile load that's picked up by the area of the plate right around the screw. It just makes sense, right? That makes sense. You wouldn't disagree with that? I wouldn't necessarily disagree with that, but it doesn't matter for the claims. The claims don't care how much tensile load is transferred. It doesn't say anything about it's got to be 100 percent of the tensile load or most of the tensile load. It just says so as to the transfer. I understood your lead argument in your blue brief to us to be the claim structure results in the transfer of tensile load, which I read to mean that you're saying there is no patentable way to the tensile load limitations, that it inherently follows that the claim limitation is satisfied as long as you have the structure. Did I understand your lead argument correctly to us or did I not? I mean, our lead argument is that the structural limitations that are recited in the claims are in Slater, it's undisputed, and those structural limitations, when you've got that screw. We're talking about the tensile load limitation. Yeah, we think it's the same. That happens because of the structure. Isn't that because of inherency? It's not because of inherency. It's because a person of skill in the art understands that when you have that structure, that's necessarily going to follow. That's a nice distinction. I'm not sure. I'm not sure how well that holds up. Go ahead. If I read it that way, and if you ever want to say it, I didn't mean to cut you off, I'm sorry, but I know we're short on time. Where in your petition do you argue that it's necessary, it's inherent, all you need to worry about is the structure. And as long as you have the structure, you practice the tensile load limitation. And again, I think what Dr. Gall said. You gave me the Gall declaration about that. I gave you that, but. Where is it in the petition? In the reply at 1107. So it's not in the petition. In the petition itself, I think it's maybe it's not, it's more implied because we talk about the structure. And then let me ask you this. As I understand what the board did, as I said to your friend on the other side, you told the board, Slater anticipates because of the vice-like structure. So board, go and find the vice-like structure in Slater. The board looked and their reading of Slater was it doesn't disclose the vice-like structure. Why is it not? Is that the way that the board understood your argument? I think the board was led astray by Osteomed making the argument that our entire, our petition depends on the vice having threads only in the second bone. But if you look at what we argue, nobody talks about where the threads are. It's not in the Gall declaration when talking about the independent claims one and 11. It is there. We do not think it's a fair reading of the petition at all. OK, thank you. Your time has expired. She didn't talk about the cross appeal, so you have nothing to reply to. Case is submitted. Thank you.